**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION**

| | | |
|---|---|---|
| **UOP LLC and UOP RUSSELL LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. _____** |
| **EXTERRAN ENERGY SOLUTIONS,** | ) | |
| **L.P. and EXTERRAN CORPORATION** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendants.** | ) | |

---

**COMPLAINT**

Plaintiffs UOP LLC and UOP Russell LLC ("UOP Russell") (collectively, "Plaintiffs"), by and through their attorneys, file this Complaint for trade secret misappropriation, breach of contract, tortious interference, and unfair competition against Defendants Exterran Energy Solutions, L.P. and Exterran Corporation (collectively, "Exterran"), and allege as follows:

**NATURE OF THE ACTION**

1.     This lawsuit arises from Exterran's ongoing misuse and misappropriation of Ortloff's[1] trade secrets and proprietary information related to the field of gas processing technology, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, the Texas Uniform Trade Secrets Act, Tex. Civ. & Rem. Code § 134A.001, *et seq.*, and Exterran's obligations under contractual agreements with UOP LLC's predecessor, Ortloff Engineers, Ltd ("Ortloff").  Further, Exterran's conduct constitutes tortious interference with prospective business

---

[1] UOP LLC acquired the vast majority of Ortloff's assets and liabilities, including Ortloff's Trade Secrets, in or around 2018.  For clarity, we refer to them as the Ortloff Trade Secrets, as explained further below.

relationships of a wholly-owned subsidiary of UOP LLC, UOP Russell, as well as unfair competition with UOP Russell.

2.      Ortloff previously entered into a series of restricted use agreements and licensing agreements with Exterran relating to Ortloff's Single Column Overhead Recycle Process ("SCORE") technology and later its Recycle Split Vapor ("RSV") technology that enabled Exterran to build optimized gas processing systems and to compete with optimized systems which it otherwise lacked the expertise to design.

3.      In 2014, Exterran agreed to build a gas processing system for a third party using the RSV technology pioneered by Ortloff.  The gas processing system was to be built in Wildhorse, Oklahoma, and is referred to below as the "Wildhorse Project."  Upon information and belief, Exterran had no prior experience with RSV technology.

4.      Accordingly, Exterran sought the help and expertise of Ortloff, the developer and recognized leader of RSV technology consistent with the parties' past dealings involving Ortloff's SCORE technology.  Ortloff granted Exterran a license to certain of its trade secrets and proprietary information, including but not limited to highly confidential electronic simulation files and design specifications, strictly subject to Exterran's agreement to protect the confidentiality of such information and to use it *solely* for the Wildhorse Project.

5.      Additionally, at the request of Exterran, Ortloff agreed to provide confidential advice and information to Exterran to enable them to use the licensed trade secrets and proprietary information effectively, again solely for the Wildhorse project.

6.      Although the agreements between Exterran and Ortloff strictly prohibit use of Ortloff's proprietary information for any purpose other than the Wildhorse Project, Ortloff's successor, UOP LLC, and UOP LLC's subsidiary, UOP Russell, recently discovered that Exterran

has used Ortloff's trade secrets and proprietary information for other projects. Among other things, Exterran used Ortloff's trade secrets and proprietary information without authorization and in breach of the parties' agreements to create designs for a separate gas processing system, referred to below as the "Chisholm II Plant."

7.      Critical aspects of the RSV designs for the Wildhorse Project and Chisholm II Plant are essentially identical, and, upon information and belief, the design Exterran used for Chisholm II would not have been developed in the same manner and on the same timetable without the use of Ortloff's trade secrets and proprietary information.

8.      Upon information and belief, Exterran has also recently bid SCORE technology in a manner that suggests it has not protected Ortloff's confidential SCORE information, and improperly used it consistent with how it has improperly used the RSV materials.

9.      Exterran's improper use of Ortloff's trade secrets and proprietary information has allowed Exterran to optimize otherwise inefficient solutions and unfairly compete against UOP Russell by tailoring bids for RSV and SCORE projects.

10.     If not enjoined, Exterran's unfair conduct will likely continue, depriving UOP Russell of further opportunities and the full value of its intellectual property.

## **THE PARTIES**

11.     Plaintiff UOP LLC is a Delaware limited liability company with a principal place of business at 25 E. Algonquin Road, Des Plaines, IL 60017-5017. In or around 2018, UOP LLC purchased nearly all of the assets and liabilities of Ortloff Engineers, Ltd., a former Texas limited partnership with its principal place of business located at 415 West Wall Street, Suite 2000, Midland, Texas 79701-4442. Ortloff Engineers, Ltd. pioneered certain gas processing

technologies, including its well-known proprietary RSV and Single Column Overhead Recycle Process ("SCORE") technologies.

12.     Plaintiff UOP Russell LLC is a Delaware limited liability company with its principal place of business located at 7130 S. Lewis Avenue, Suite 500, Tulsa, Oklahoma 74136. UOP Russell is a wholly owned subsidiary of UOP LLC.

13.     Defendant Exterran Energy Solutions, L.P. is a Delaware limited partnership with its principal place of business, upon information and belief, located at 16666 Northcase Drive, Houston, TX 77060.

14.     Upon information and belief, Defendant Exterran Corporation is a Delaware corporation with its principal place of business, upon information and belief, located at 11000 Equity Drive, Houston, TX 77041.  Upon information and belief, Defendant Exterran Energy Solutions, L.P. is wholly owned by Defendant Exterran Corporation.

## JURISDICTION AND VENUE

15.     Jurisdiction is based on 28 U.S.C. § 1331 and UOP LLC's claims under 18 U.S.C. § 1836, *et seq.*, for misappropriation of trade secrets under the Defend Trade Secrets Act.

16.     This Court has supplemental jurisdiction pursuant to 28 U.S.C § 1367 over all other claims that do not arise under the Constitution, laws, or treaties of the United States because they involve a common nucleus of operative facts.

17.     This Court has personal jurisdiction over Defendants Exterran Energy Solutions, L.P. and Exterran Corporation because their headquarters are located in Texas.

18.     Venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Exterran Energy Solutions, L.P. resides in this judicial district for purposes of 28 U.S.C. § 1391(c)(2) and (d), due at least to the contractual agreements it entered into with Ortloff on

September 11, 2014 and December 12, 2014 and its contacts with Ortloff as described below, and both Defendants reside in Texas.

19.     Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district.

## FACTUAL ALLEGATIONS

### I.     Ortloff's Revolutionary Technology and Expertise

20.     Ortloff has been a pioneer in the field of gas processing technology for over fifty years. Ortloff built a robust business of developing and licensing intellectual property relating to its pioneering and proprietary gas processing technology portfolio.

21.     Ortloff's predecessor, The Ortloff Corporation, made substantial investments in time, money, and engineering resources to develop multiple gas processing technologies and know-how through its work as an engineering, procurement, and construction ("EPC") contractor.

22.     Among other things and as a direct result of its investments, Ortloff Corporation revolutionized recovery of ethane and propane from natural gas streams in the late 1970s with its development of several innovative technologies, including the Gas Subcooled Process ("GSP"). Gas processing plants use a low-temperature fractional distillation column called a demethanizer to separate the desired hydrocarbon liquids (ethane and propane) from the natural gas streams. GSP improves the efficiency of the distillation column by incorporating condensed vapors from the feed gas (the "reflux stream") into the distillation column, which flows downward through the column, cooling the upflowing vapors.  This technology has since become an industry standard.

23.     The Ortloff Corporation withdrew from EPC contracting in 1985 and formed Ortloff to supply and develop its technologies and know-how, including proprietary technologies

related to natural gas liquid ("NGL") and liquefied petroleum gas ("LPG") recovery technologies. Ortloff then operated as a specialized engineering, consulting, and licensing firm that developed and licensed technology in the gas processing technology field.  Since its formation, Ortloff NGL/LPG technologies have been licensed to process over 50 billion standard cubic feet a day of natural gas in more than 120 plants located in over 20 countries.

24.     In the late 1990's, Ortloff developed the state-of-the-art and revolutionary Recycle Split Vapor ("RSV") process for NGL/LPG recovery, which is a substantial enhancement over Ortloff's pioneering GSP technology, as well as other competing GSP technologies.  As shown in the schematic below, the RSV design incorporates an additional rectification section into the demethanizer column, above the reflux stream feed point of the GSP process.  A second, relatively smaller reflux stream feeds into the top of the additional rectification section.



25.     For reference, the outside of an RSV plant, including the demethanizer columns, is shown below:



26.     The RSV process provides a competitive advantage and yields many significant and differentiating commercial benefits for gas processing plants, including: ethane and propane recovery levels up to 99 percent; increased recovery of desired hydrocarbon liquids with no increase in horsepower requirements; increased capacity with no increase in horsepower requirements; lower capital cost; high carbon dioxide tolerance in the feed stream; improved operational stability; improved operating flexibility as the system can perform dual mode ethane and propane recovery; and the ability to maintain ultra-high propane recovery.  The RSV process can be retrofit into existing NGL/LPG gas processing recovery plants or included in designs for new facilities.

27.     In addition to RSV technology, Ortloff also developed the state-of-the-art and revolutionary Single Column Overhead Recycle ("SCORE") process for NGL/LPG recovery, particularly with respect to propane and heavier hydrocarbon recovery, in the late 1990's.  The

SCORE design was an enhancement of Ortloff's popular Overhead Recycle Process, combining extremely high propane recovery with high efficiency.  As shown in the schematic below, SCORE operates by providing a reflux for its distillation column, which is generated by cooling and at least partially condensing a vapor side draw stream from the distillation column.  A liquid side draw is utilized for process cooling to optimize heat integration.



28.     For reference, the outside of a SCORE plant, including the deethanizer columns, is shown below:



29.     Like RSV processes, SCORE processes provide significantly higher LPG recovery with lower operating costs.  For example, SCORE processes provide a competitive advantage and yield many significant and differentiating commercial benefits for gas processing plants, including: ultra-high propane recovery levels of greater than 98%, increased recovery of desired hydrocarbon liquids with no increase in horsepower requirements; increased capacity with no increase in horsepower requirements; lower capital cost; high carbon dioxide tolerance in the feed stream; and improved operational stability.

30.     In connection with inventing these revolutionary processes, Ortloff and its predecessor applied for and obtained patents covering GSP systems and, later, RSV and SCORE systems as well as numerous other systems.

31.     Over decades of innovation, however, Ortloff also developed a trove of know-how and confidential information related to the design, installation, and optimization of GSP, RSV, and SCORE systems. This know-how and confidential information was not disclosed in Ortloff's patents.

32.     In fact, through years of developing and configuring RSV and SCORE systems for customers, Ortloff gained significant know-how and critical insights to enable Ortloff to address unique and difficult challenges that others in the industry would not even recognize, and if they were aware, could not resolve as efficiently and quickly as an expert like Ortloff.

33.     This knowledge and insight, which could only be obtained through years of managing such systems, not only increases the economic value and efficiency of RSV and SCORE systems, but significantly shortens time frames for designing, bidding on, building, and initiating gas processing plants by being able to anticipate and avoid shortfalls that increase costs and result in delays.

34.     Ortloff has protected this know-how, as well as the specific information derived from using such know-how, as trade secrets and proprietary information.

35.     Ortloff's trade secrets and proprietary information ("Ortloff Trade Secrets") include, but are not limited to the following, individually and in combination: (i) RSV or SCORE process design simulation files and supporting specifications (including specific design parameters and specifications); (ii) RSV or SCORE process flow diagrams; (iii) RSV or SCORE process descriptions; (iv) heat and material balance summaries and diagrams for RSV or SCORE; (v) process control philosophy and process control diagrams for RSV or SCORE; (vi) RSV or SCORE piping and instrument diagrams ("P&IDs"); (vii) RSV or SCORE equipment sizing, design calculations, and methodology; (ix) RSV equipment data sheets; (x) RSV or SCORE process

optimization methodology; (xi) RSV or SCORE process design concepts; (xii) RSV or SCORE mechanical design concepts; and (xiii) parameters and configurations related to design of specific projects.

36.     Examples of the Ortloff Trade Secrets, individually or in combination, include demethanizer or deethanizer tower operating pressure, cold separator operating temperature, feed rates and locations of those feeds to the demethanizer or deethanizer column, the number of distillation stages, the flow rate and temperature of recycle streams, and the resulting demethanizer or deethanizer column diameter and packing size and height for the various sections of the column. Additionally, arriving at certain ranges of these parameters (individually or in combination), or knowing how to adjust these parameters from prior learnings, reflect use of Ortloff Trade Secrets in the design process.

37.     Ortloff and its successor UOP LLC have taken, and still take, extensive measures to maintain the secrecy of the Ortloff Trade Secrets.  For example, Ortloff and UOP LLC have at all times required their employees to keep Ortloff Trade Secrets strictly confidential.  Ortloff took, and UOP LLC takes, steps to secure information systems and offices containing confidential information, including the Ortloff Trade Secrets.

38.     Further, Ortloff and UOP LLC have permitted limited access to and use of the Ortloff Trade Secrets by persons outside of Ortloff or UOP LLC only pursuant to confidentiality agreements, restricted use agreements, or limited licenses that include strict confidentiality provisions, including commitments ensuring that any employees of non-Ortloff entities with access to the Ortloff Trade Secrets are subject to corresponding confidentiality and restricted use obligations.

39.     To the best of UOP LLC's knowledge, the Ortloff Trade Secrets are not known to anyone other than those subject to the aforementioned strict confidentiality and restricted use obligations.  As such, the Ortloff Trade Secrets, individually and in combination, are not in the public domain and not readily derivable from public knowledge or third parties (as the agreements stipulate), and likewise are not generally known to or readily ascertainable through proper means (as the federal and Texas trade secret statutes require).

40.     UOP LLC has a competitive advantage because of the secrecy of the Ortloff Trade Secrets.  For example, because the Ortloff Trade Secrets are not in the public domain, and because those trade secrets and proprietary information offer substantial commercial benefits to gas processing plant operators, Ortloff and UOP LLC have been able to maintain valuable licensing and consulting programs, even after its RSV and SCORE-related patents expired.

41.     Ortloff successfully licensed Ortloff's RSV and SCORE technologies (both patented technology and non-patented Ortloff Trade Secrets), including to some of the top gas processing plant EPC contractors and gas processing plant operators in the United States and worldwide, for substantial consideration.  Ortloff and its predecessors have granted more than 70 GSP-related licenses, more than 35 RSV-related licenses, and more than 75 SCORE-related licenses to Ortloff's patents and the Ortloff Trade Secrets.  Licensees continue to pay substantial sums to take licenses to the Ortloff Trade Secrets, without which they would be unable to offer or benefit from competitive RSV and/or SCORE systems.

42.     UOP LLC, like Ortloff before it, operates as a specialized engineering, consulting, and licensing firm that develops and licenses technology.  Historically, UOP LLC specialized in offering licenses and expertise in refining and petrochemical technologies; however it recognized that it did not have sufficient internal expertise in gas processing technologies. In or around 2018,

UOP LLC, recognizing this deficiency and the substantial value of and competitive advantages gained from Ortloff's gas processing technologies invested millions of dollars to acquire Ortloff's intellectual property, including Ortloff's Trade Secrets related to the RSV and SCORE technologies, as well as numerous other technologies.

43.     Before purchasing Ortloff, UOP LLC did not have access to Ortloff's Trade Secrets regarding RSV or SCORE technologies.  Since the acquisition, UOP LLC has continued to provide consulting services to help licensees effectively utilize Ortloff's Trade Secrets relating to its RSV and SCORE technologies.   Through these licensing and consulting agreements, UOP LLC generates royalty and consulting revenue from its licensees, and its licensees, in turn, generate revenue by using the Ortloff Trade Secrets in designing, installing, and optimizing GSP, RSV, and SCORE systems.

44.     One of the licensees of the Ortloff Trade Secrets is UOP Russell.  Like Ortloff's predecessor, the Ortloff Corporation, UOP Russell is an EPC contractor.  Prior to the acquisition of Ortloff by UOP LLC, UOP Russell had taken, and since that time has continued to take licenses to Ortloff's patents, trade secrets, and proprietary information, including the Ortloff Trade Secrets relating to RSV and SCORE.  Even after the expiration of Ortloff's RSV and SCORE-related patents, UOP Russell, like other licensees, continues to pay substantial sums to take licenses to the Ortloff Trade Secrets, without which UOP Russell would be unable to offer competitive RSV and/or SCORE systems to its customers.

II.     **Exterran Turns to Ortloff for Help**

45.     On information and belief, in or around 2014, a third party hired Exterran to develop an RSV system for that third party's Wildhorse Plant (the "Wildhorse Project") in Oklahoma.

46.     On information and belief, Exterran had never developed an RSV system before engaging Ortloff to help with the Wildhorse Project.

47.     Although Exterran had experience with GSP technology, it had no experience with designing and optimizing RSV systems that require substantial modifications relative to the GSP technology, including, for example, the top portion of the demethanizer column.

48.     Because Exterran lacked the expertise necessary to optimize the design for and implement these modifications, Exterran's original RSV design parameters for the Wildhorse Project were insufficient and, on information and belief, were incapable of providing a competitive offering, due to high capital and operating costs associated with the design.

49.     Lacking the necessary expertise to design and optimize an RSV system, in or around July 2014, Exterran engaged Ortloff to provide its expertise in developing an optimized RSV system for the Wildhorse Plant.

50.     To that end, on July 24, 2014, Exterran engineer Dave Pharis emailed Ortloff engineer Tony Martinez, requesting "simulations"—proprietary data files run by a simulation program (an executable computer program) to generate RSV system designs and simulate operation based on design parameter inputs.  But before Ortloff could provide any expertise to help develop an RSV system for the Wildhorse Plant, Ortloff required Exterran to sign a Restricted Use Agreement ("RUA") to protect Ortloff's Trade Secrets.

51.     Exterran, understanding and accepting the need for a RUA, executed a RUA related to the Wildhorse Project on September 11, 2014 ("Wildhorse RUA").  Among other protections, the Wildhorse RUA required that Exterran agree to use "Ortloff Proprietary Information **only for the purpose** stated above [i.e., the Wildhorse Project], and not to make any further use of such

information **before** executing an appropriate Technology License Agreement with ORTLOFF." The Wildhorse RUA is attached hereto as Exhibit 1.

52.    In addition to the Wildhorse RUA, Exterran and Ortloff entered into a license agreement on December 12, 2014 ("Wildhorse License Agreement").  Among other provisions, the Wildhorse License Agreement granted Exterran "a nonexclusive license under the Patent Rights and/or to the Proprietary Know-how solely for the design, construction, operation, maintenance, lease, enhancement, optimization, and/or repair of the [the Wildhorse Plant] . . . ." Further, Exterran agreed not to "use the [licensed] Patent Rights and/or Proprietary Know-how herein licensed for any purpose, except as provided [in the Wildhorse License Agreement]."  The Wildhorse License Agreement is attached hereto as Exhibit 2.

53.    Only after the RUA was executed did Ortloff provide Exterran with its Trade Secrets, including, but not limited to, Ortloff simulation files, P&IDs, and component specifications.

54.    On information and belief, Exterran utilized Ortloff's RSV design, which was derived from Ortloff's Trade Secrets, to bid for and ultimately win the Wildhorse Project, as authorized by the Wildhorse RUA and Wildhorse License Agreement.

55.     In addition to asking Ortloff for help designing the Wildhorse Project, Exterran had been a multiple licensee of Ortloff Trade Secrets related to Ortloff's SCORE technology for use in SCORE-related projects.

56.    For example, on June 9, 2003, Exterran, through its predecessor The Hanover Company, executed a Restricted Use Agreement related to the design of the Jamshoro Joint Venture Ltd. LPG Recovery Project ("Jamshoro RUA").  On December 22, 2003, Ortloff (through its parent company Elkcorp), entered into a License Agreement with The Hanover Company (now

Exterran) licensing Ortloff's Trade Secrets for the Jamshoro Joint Venture Ltd. LPG Recovery Plant ("Jamshoro License 1").  The Jamshoro RUA and Jamshoro License 1 are attached hereto as Exhibits 3 and 4, respectively.

57.     On November 28, 2006, Ortloff and Exterran (through its predecessor Hanover Compression Limited Partnership) executed a license agreement licensing Ortloff's Trade Secrets for the Jamshoro Joint Venture Ltd. LPG Recovery Plant No. 2 ("Jamshoro License 2").  The Jamshoro License 2 is attached hereto as Exhibit 5.

58.     On June 21, 2007, Ortloff and Exterran (through its predecessor Hanover Compression Limited Partnership) executed license agreements related to "Crescent Petroleum Co. Khor Mor LPG Recovery Plant No. 1" ("Kohr Mor License 1") and "Crescent Petroleum Co. Kohr Mor LPG Recovery Plant No. 2" ("Khor Mor License 2").  Khor Mor License 1 and Khor Mor License 2 are attached hereto as Exhibits 6 and 7, respectively.

59.     The Jamshoro RUA, Jamshoro License 1, Jamshoro License 2, Kohr Mor License 1, and Kohr Mor License 2 (collectively, the "SCORE Agreements") licensed, or authorized the use of, Ortloff's Trade Secrets related to Ortloff's SCORE technology.

60.     Under the terms of the SCORE Agreements, Ortloff provided Trade Secrets to Exterran, including, but not limited to, Ortloff simulation files, P&IDs, and component specifications.

61.     Like the Wildhorse RUA and Wildhorse License Agreement, the SCORE Agreements were all "limited use" agreements granting a license, or use of, Ortloff's Trade Secrets for certain authorized projects.  These authorized projects were explicitly designated in the SCORE Agreements.

62.     On information and belief, Exterran utilized Ortloff's SCORE design, which was derived from Ortloff's Trade Secrets, to bid for the projects designated in the SCORE Agreements.

**III. Exterran Uses Ortloff's Trade Secrets to Bid for and Construct the "Chisholm II Plant"**

63.     On information belief, in 2015, Exterran was engaged by a third party to build an RSV plant in Oklahoma—the "Chisholm II Plant."

64.     Ortloff personnel learned of the Chisholm II Plant project at that time and contacted Exterran to ensure Exterran had and would not use Ortloff Trade Secrets in connection with this project, as Ortloff had not licensed or given permission for such use.

65.     At that time, Exterran personnel assured and represented to Ortloff that the Ortloff Trade Secrets had been appropriately segregated and secured and were not used in connection with the Chisholm II Plant.

66.     Exterran personnel further assured and represented that the process engineer on the Wildhorse Project, Dave Pharis, was not involved with the Chisholm II Plant.

67.     In 2017, the owner of the Chisholm II Plant engaged Ortloff to complete a study and recommendation for potential upgrades to the plant that would allow greater flexibility in the recovery and extraction of hydrocarbon liquids, allowing for a greater diversity of plant outputs.

68.     To perform that work, the owner of the Chisholm II Plant provided Ortloff with technical documents, such as data sheets and P&IDs, that had been generated by Exterran for the Chisholm II Plant in or around 2015.  Upon information and belief, none of Ortloff, UOP LLC, or UOP Russell had access to these documents, or the information therein, before they were provided by the owner of the Chisolm II Plant.

69.     In approximately February 2018, certain Ortloff technical leaders became involved with the Chisholm II project.  Upon review of the Chisholm II data sheets and P&IDs, they readily

observed that they exhibited indisputable, substantial similarities to the Wildhorse Project.  For example, numerous critical design parameters, including in relation to the heat exchangers and top portion of the demethanizer column, were identical.

70.     Further, the Chisholm II P&IDs were initialed by Exterran engineer "DBP"—the initials of Mr. Pharis, who had been the lead engineer and primary contact with Ortloff on the Wildhorse Project.  As discussed above, Mr. Pharis was the recipient of the confidential Ortloff Trade Secrets provided to Exterran during that project.

71.     Mr. Pharis's evident role as lead engineer on the Chisholm II Project was directly contrary to Exterran's prior representation and assurance that there would be no overlap in engineers between the two projects.

72.     Exterran (including Mr. Pharis) designed the RSV system for the Chisholm II plant in or around 2015, and, upon information and belief, Exterran began its Chisholm II design process simultaneously or shortly after its design for the Wildhorse Project.

73.     Given the extensive time and resources necessary to develop RSV technology from GSP, Exterran and Mr. Pharis could not have independently developed the RSV system at the Chisholm II plant without utilizing the Ortloff Trade Secrets.

74.     In fact, Exterran's lack of expertise with RSV systems (as demonstrated by Exterran's communications during the Wildhorse Project only a year before) and the overlapping timing between the design of the two plants demonstrates that the shortened time frame that it took to design the Chisholm II Plant was achieved only through improperly leveraging the know-how Exterran gained from Ortloff, including the Ortloff Trade Secrets, during the Wildhorse Project.

75.     On information and belief, Exterran's project engineer, Dave Pharis, utilized the simulation model for the Wildhorse Project (which included and incorporated Ortloff's Trade Secrets) as his basis and starting point for the simulation for the Chisholm II project.

76.     A comparison of the Wildhorse Project and Chisholm II documents shows that Exterran reused and copied numerous design parameters from the Wildhorse Project that were developed using or benchmarking the Ortloff Trade Secrets.  These parameters include, but are not limited to, the demethanizer tower diameter, packing size, bed height, number of total stages, and intermediate feed locations as well as flow characteristics into the gas/gas exchanger and reflux condenser, all of which were used by Exterran with minor or no changes.

77.     On information and belief, these extensive identical and/or substantially similar features demonstrate that Exterran used the Ortloff Trade Secrets, including simulation files and related design parameters and specifications, for work other than the Wildhorse Project.  Such use is expressly prohibited by both the Wildhorse RUA and License Agreement.

78.     Exterran's unauthorized use is further evidenced by the Chisholm II Equipment Datasheet, which included a component, called a gas/gas exchanger, with identical specifications as the one specified for the Wildhorse Plant.  A gas/gas exchanger is designed to cool incoming streams using a cold product stream from the gas processing system.  The selection of a given gas/gas exchanger reflects critical design choices for a gas processing plant.  For example, the specifications of the feed into the gas/gas exchanger and into the reflux condenser (such as flow and temperature characteristics) reflect design decisions made during the process of optimizing the efficiency of the overall gas processing plant.

79.     The Chisholm II P&IDs indicated that, rather than make independent design choices for the new plant or seek out needed expertise like it did with the Wildhorse Project,

Exterran defaulted to the design choices used in the Wildhorse Project—design choices resulting from use of the Ortloff Trade Secrets. This is evidenced by Exterran's decision to simply repurchase a gas/gas exchanger from the vendor that manufactured the component for the Wildhorse Plant. Upon information and belief, this demonstrates that Exterran took the design choices developed for the Wildhorse Plant—using the Ortloff Trade Secrets—and reused them in the design of the Chisholm II facility.

80.     Upon information and belief, Exterran's misuse of Ortloff Trade Secrets is continuing. For example, upon information and belief, Exterran continues to offer RSV technology to customers, reusing the design from the Wildhorse Project or otherwise using the Ortloff Trade Secrets. This includes the parameters and techniques taught to Exterran and, in particular, to Mr. Pharis, while working on the Wildhorse Project.

81.     In or around September 2018, shortly after Exterran's misappropriation of the Ortloff Trade Secrets came to light, Ortloff's assets and liabilities, including the Ortloff Trade Secrets, were purchased by UOP LLC. Although it is now part of UOP LLC and is no longer a separate entity, Ortloff's facilities and information, which remain located in Midland, Texas, are kept separate from other entities owned by UOP LLC, such as UOP Russell.

82.     UOP Russell is a wholly owned subsidiary of UOP LLC. UOP Russell sells pre-engineered, standard plant designs as well as offering EPC capabilities and various optimization services.

83.     UOP Russell has aided in designing or optimizing more than 100 plants currently installed throughout the United States.

84.     UOP Russell competes with Exterran for contracts in the gas processing plant field. As noted above, UOP Russell has, for many years, licensed technology from Ortloff, including its

cutting-edge RSV technology.  The RSV technology is still extremely valuable; for example, upon information and belief, there remain over 150 GSP-based gas processing plants that could be retrofit with RSV technology.

85.     After UOP LLC purchased Ortloff, UOP LLC became aware of Exterran's conduct in connection with the Chisholm II Plant.  UOP LLC then raised those concerns directly with Exterran.

86.     Since the Wildhorse Project, UOP Russell has lost a number of gas processing plant contract bids to Exterran.  Upon information and belief, at least two of these bids, in addition to the Chisholm II and the Chisholm III Plants, relate to or use RSV systems.

### IV. Exterran Uses Ortloff's SCORE Trade Secrets to Bid for Unlicensed SCORE Projects.

87.     Upon information and belief, Exterran has bid on one or more projects using Ortloff's Trade Secrets related to SCORE.  These bids were made without Ortloff's knowledge and without appropriate license agreements for Ortloff's Trade Secrets.

88.     As indicated above, Dave Pharis was a process engineer on prior licensed SCORE projects.  Upon information and belief, Dave Pharis failed to protect SCORE-related Trade Secrets and Exterran used those protected SCORE Trade Secrets, in the same way it failed to protect and used the RSV Trade Secrets, to formulate unlicensed competing bids.

89.     On information and belief, Exterran misused Ortloff's Trade Secrets to bid for at least one specific unlicensed SCORE project in approximately 2018 in West Virginia.

90.     Upon information and belief, UOP Russell has lost SCORE-related bids because UOP Russell's bids had to account for licensing fees for the Ortloff Trade Secrets, whereas Exterran has taken a free ride approach to bidding by using Ortloff's Trade Secrets without

permission or payment and in violation of its contractual obligations, and as a free rider did not need to account for Ortloff's licensing fees in its bid.

91.     In addition, Exterran's use of Ortloff Trade Secrets without authorization has decreased the value of Ortloff's assets, including the Ortloff Trade Secrets, harming UOP LLC.

92.     Exterran's unauthorized and improper use of the Ortloff Trade Secrets has caused or will cause further substantial economic harm and disadvantage to UOP LLC, including loss of exclusive use and control of the Ortloff Trade Secrets, and other harms.

93.     Exterran's unauthorized and improper use of the Ortloff Trade Secrets has caused or will cause further substantial economic harm and disadvantage to Plaintiffs, including lost profits, lost revenue, unjust enrichment, and other harms.

## FIRST CLAIM FOR RELIEF

**(Misappropriation of Trade Secrets Under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.*)**

**(By Plaintiff UOP LLC Against All Defendants)**

94.     UOP LLC repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

95.     UOP LLC owns and possesses trade secrets and proprietary information, including the Ortloff Trade Secrets.  The Ortloff Trade Secrets are the products of valuable research and development, time and effort, and investment by Ortloff, and considerable investment by UOP LLC.

96.     The Ortloff Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use of that information.  Among other

-22-

things, access to Ortloff's Trade Secrets provides a competitive advantage to Ortloff and its licensees, to which third parties do not have access.

97.     Ortloff and UOP LLC have taken reasonable and extensive measures to keep secret the Ortloff Trade Secrets, including by limiting access to the Ortloff Trade Secrets to those who have undertaken to protect their secrecy and limit their use.

98.     The Ortloff Trade Secrets all relate to products and services used, sold, shipped, and/or ordered, or intended to be used, sold, shipped, and/or ordered, in interstate commerce.

99.     At no time did Ortloff or UOP LLC consent to Exterran's use or disclosure of the Ortloff Trade Secrets for any purpose other than the limited use allowed by the RUA and the License Agreement.

100.    In violation of UOP LLC's rights, Exterran misappropriated the Ortloff Trade Secrets in an improper and unlawful manner as alleged herein, within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836, by using the Ortloff Trade Secrets in a manner that exceeded the scope of the Wildhorse RUA and the Wildhorse License Agreement.  Exterran misappropriated the Ortloff Trade Secrets at least by employing them in connection with projects other than the Wildhorse Project, including at least the Chisholm II Plant.

101.    In further violation of UOP LLC's rights, Exterran misappropriated the Ortloff Trade Secrets in an improper and unlawful manner as alleged herein, within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836, by using the Ortloff Trade Secrets in a manner that exceeded the scope of the SCORE Agreements.  Upon information and belief, Exterran misappropriated the Ortloff Trade Secrets at least by employing them in connection with projects other than those listed in the SCORE Agreements, including the recent project in West Virginia.

102.     Exterran willfully and maliciously misappropriated the Ortloff Trade Secrets within the meaning of 18 U.S.C. § 1836(b)(3)(C).

103.     As a direct, foreseeable, and proximate result of Exterran's misappropriation, UOP LLC has suffered and/or will suffer damage within the meaning of 18 U.S.C. § 1836(b)(3)(B), in the form of lost profits, including but not limited to lost value of the purchase of Ortloff's assets, lost licensing fees, lost consulting fees, consequential damages associated with lost licenses, unjust enrichment and reasonable royalty and/or punitive damages, as well as price erosion in amounts as yet unknown and to be proven at trial.

104.     If Exterran's conduct is not remedied, it will continue to misappropriate and use for its own benefit, and to UOP LLC's detriment, the Ortloff Trade Secrets, causing UOP LLC irreparable injury and significant additional damages, in an amount to be proven at trial.

105.     Because UOP LLC's remedy at law is inadequate, UOP LLC seeks, in addition to damages, injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to recover and protect the Ortloff Trade Secrets and other legitimate business interests.  UOP LLC's business relies on its reputation and ability to maintain and license the Ortloff Trade Secrets, and UOP LLC will continue suffering irreparable harm absent injunctive relief.

## SECOND CLAIM FOR RELIEF

**(Misappropriation of Trade Secrets Under the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001, *et seq.*)**

**(By Plaintiff UOP LLC Against All Defendants)**

106.     UOP LLC repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

107.    UOP LLC owns and possesses trade secrets and proprietary information, including the Ortloff Trade Secrets.  The Ortloff Trade Secrets are the products of valuable research and development, time and effort, and investment by Ortloff.

108.    The Ortloff Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from the disclosure or use of that information.  Among other things, access to the Ortloff Trade Secrets provides a competitive advantage to Ortloff and its licensees, to which third parties do not have access.

109.    Ortloff and UOP LLC have taken reasonable and extensive measures to keep secret the Ortloff Trade Secrets, including by limiting access to the Ortloff Trade Secrets to those who have undertaken to protect their secrecy and limit their use.

110.    At no time did Ortloff or UOP LLC consent to Exterran's use or disclosure of the Ortloff Trade Secrets for any purpose other than the limited use allowed by the RUA and the License Agreement, which are both governed by Texas law.

111.    In violation of UOP LLC's rights, Exterran misappropriated the Ortloff Trade Secrets in an improper and unlawful manner as alleged herein, within the meaning of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001, *et seq.*, by using the Ortloff Trade Secrets in a manner that exceeded the scope of the RUA and the License Agreement. Exterran misappropriated the Ortloff Trade Secrets by using them in connection with projects other than the Wildhorse Project, including at least the Chisholm II Plant.

112.    In further violation of UOP LLC's rights, Exterran misappropriated the Ortloff Trade Secrets in an improper and unlawful manner as alleged herein, within the meaning of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001, *et seq.*, by using the

Ortloff Trade Secrets in a manner that exceeded the scope of the SCORE Agreements. Upon information and belief, Exterran misappropriated the Ortloff Trade Secrets at least by employing them in connection with projects other than those listed in the SCORE Agreements, including the project in West Virginia.

113. Exterran willfully and maliciously misappropriated the Ortloff Trade Secrets within the meaning of Tex. Civ. Prac. & Rem. Code § 134A.004(b).

114. As a direct, foreseeable, and proximate result of Exterran's misappropriation, UOP LLC has suffered and/or will suffer damage within the meaning of Tex. Civ. Prac. & Rem. Code § 134A.004(a) in the form of lost profits, including but not limited to lost value of the acquisition of Ortloff's assets, lost licensing fees and price erosion, consequential damages associated with lost licenses, unjust enrichment, and reasonable royalty and/or punitive damages, as well as price erosion, in amounts as yet unknown and to be proven at trial.

115. If Exterran's conduct is not remedied, it will continue to misappropriate and use for its own benefit, and to UOP LLC's detriment, the Ortloff Trade Secrets, causing UOP LLC irreparable injury and significant additional damages, in an amount to be proven at trial.

116. Because UOP LLC's remedy at law is inadequate, UOP LLC seeks, in addition to damages, injunctive relief pursuant to Tex. Civ. Prac. & Rem. Code § 134A.003 to recover and protect the Ortloff Trade Secrets and other legitimate business interests. UOP LLC's business relies on its reputation and ability to maintain and license the Ortloff Trade Secrets, and UOP LLC will continue suffering irreparable harm absent injunctive relief.

## THIRD CLAIM FOR RELIEF

**(Breach of Contract Under Texas Law – The Wildhorse Agreements)**

**(By Plaintiff UOP LLC Against All Defendants)**

117.    UOP LLC repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

118.    On September 11, 2014, Ortloff and Exterran entered into the Wildhorse RUA, for good and valuable consideration.

119.    On December 12, 2014, Ortloff and Exterran entered into the Wildhorse License Agreement, for good and valuable consideration.

120.    The Wildhorse RUA and the Wildhorse License Agreement, both of which Exterran knowingly and willingly entered into, are valid and enforceable contracts.

121.    Ortloff at all times performed its contractual duties under the Wildhorse RUA and the Wildhorse License Agreement, including by providing the Ortloff Trade Secrets to Exterran pursuant to the confidentiality and limited use restrictions of the Wildhorse RUA and the Wildhorse License Agreement.

122.    The Wildhorse RUA provides that "Ortloff Proprietary Information" can be used by Exterran "solely for the purpose of enabling [Exterran] to evaluate the Ortloff Proprietary Information for possible use in the design of the [Wildhorse Plant]."  Under the Wildhorse RUA Exterran agreed "to use said Ortloff Proprietary Information only for the purpose . . . and not to make any further use of such information before executing an appropriate Technology License Agreement with Ortloff."

123.     The Wildhorse License Agreement grants Exterran "a nonexclusive license . . . to the Proprietary Know-how solely for the design, construction, operation, maintenance, lease, enhancement, optimization, and\or repair of the ["Wildhorse Plant] . . . ."

124.     Under Article 2.06, Exterran agreed to "not sublicense or otherwise authorize any other person to practice the Proprietary Know-how and Patent Rights, nor will [Exterran] use the Proprietary Know-how and Patent Rights herein licensed for any purpose except as provided herein."

125.     Exterran used Ortloff Trade Secrets for projects other than the Wildhorse Project, including at least the Chisholm II Plant.  In doing so, Exterran breached its contractual duties under the Wildhorse RUA and the Wildhorse License Agreement not to use Ortloff Proprietary Information for any purpose other than the Wildhorse Project.

126.     The Ortloff Trade Secrets disclosed to Exterran were not known to Exterran prior to Ortloff's disclosure of them to Exterran pursuant to the Wildhorse RUA and Wildhorse License Agreement.  Additionally, the Ortloff Trade Secrets are not part of the public domain (individually or in combination) or otherwise readily derivable from public knowledge or third parties.

127.     On information and belief, Exterran did not independently develop those design parameters or other Ortloff Trade Secrets, nor did Exterran acquire them from a third party with a right to make such a disclosure.

128.     UOP LLC purchased all of Ortloff's assets and contractual rights and liabilities, including rights under the Wildhorse RUA and Wildhorse License Agreement.

129.     As a direct, foreseeable, and proximate result of Exterran's breach of the Wildhorse RUA and Wildhorse License Agreement, UOP LLC has been and/or will be damaged in the form of direct and consequential damages, including but not limited to lost value of the acquisition of

Ortloff's assets, lost profits and other lost revenue and/or Exterran's unjust enrichment at UOP LLC's expense.

## FOURTH CLAIM FOR RELIEF

**(Breach of Contract Under Texas Law – The SCORE Agreements)**

**(By Plaintiff UOP LLC Against All Defendants)**

130.    UOP LLC repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

131.    Between 2003 and 2007, Ortloff and Exterran (or its predecessor company) entered into a series of agreements relating to Ortloff's SCORE technology and Ortloff's Trade Secrets (the "SCORE Agreements"), attached hereto as Exhibits 3, 4, 5, 6, and 7.

132.    The parties entered into the SCORE Agreements, for good and valuable consideration.

133.    The SCORE Agreements are valid and enforceable contracts.

134.    Ortloff at all times performed its contractual duties under the SCORE Agreements, including by providing the Ortloff Trade Secrets to Exterran pursuant to the confidentiality and limited use restrictions of the SCORE Agreements.

135.    Contrary to the SCORE Agreements and without Ortloff's permission, Exterran used Ortloff Trade Secrets for projects other than the projects identified in the SCORE Agreements, including at least the approximately 2018 project in West Virginia.

136.    The Ortloff Trade Secrets disclosed to Exterran were not known to Exterran prior to Ortloff's disclosure of them to Exterran pursuant to the SCORE Agreements.  Additionally, the Ortloff Trade Secrets are not part of the public domain (individually or in combination) or otherwise readily derivable from public knowledge or third parties.

137.    On information and belief, Exterran did not independently develop those design parameters or other Ortloff Trade Secrets, nor did Exterran acquire them from a third party with a right to make such a disclosure.

138.    UOP LLC purchased all of Ortloff's assets and contractual rights and liabilities, including rights under the SCORE Agreements.

139.    As a direct, foreseeable, and proximate result of Exterran's breach of the SCORE Agreements, UOP LLC has been and/or will be damaged in the form of direct and consequential damages, including but not limited to lost value of the acquisition of Ortloff's assets, lost profits, and other lost revenue and/or Exterran's unjust enrichment at UOP LLC's expense.

## FIFTH CLAIM FOR RELIEF

**(Tortious Interference With a Prospective Business Relationship Under Texas Law)**

**(By Plaintiff UOP Russell Against All Defendants)**

140.    UOP Russell repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

141.    UOP Russell has bid for numerous contracts for the construction of gas processing systems, and specifically gas processing systems employing SCORE and RSV technologies, under license from Ortloff/UOP, Inc. and after Ortloff disclosed Trade Secrets to Exterran.

142.    As part of these bids, UOP Russell accounted for Ortloff's licensing fees, which necessarily raised the quoted price.

143.    UOP Russell had a reasonable expectation of entering into business relationships with customers, including the third-party owner of Chisholm II, by winning a substantial portion of the contracts for which it bid.

144.    Upon information and belief, Exterran knew of UOP Russell's bids and was also bidding for the same contracts.

145.    Upon information and belief, Exterran unfairly undercut UOP Russell's bids, by unlawfully misappropriating Ortloff's RSV and SCORE technology, including the Ortloff Trade Secrets.  Upon information and belief, UOP Russell lost those bids because UOP Russell had to account for Ortloff's licensing fees, whereas Exterran won those bids because it used the Ortloff Trade Secrets without permission and in violation of its contractual obligations, and therefore did not need to account for Ortloff's licensing fees in its bid.

146.    As a direct, foreseeable, and proximate result of Exterran's tortious interference, UOP Russell has been and/or will be damaged in the form of direct and consequential damages, including but not limited to lost profits, lost bids, and other lost revenue and/or Exterran's unjust enrichment at UOP Russell's expense.

## SIXTH CLAIM FOR RELIEF

**(Unfair Competition by Common Law Misappropriation Under Texas Law)**

**(By Plaintiff UOP Russell Against All Defendants)**

147.    Plaintiff UOP Russell repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

148.    Ortloff created its RSV and SCORE Trade Secrets, including the Ortloff Trade Secrets, through extensive time, labor, skill, and money.

149.    UOP Russell, through the expenditure of substantial funds, acquired licenses to use Ortloff's RSV and SCORE technologies, including the Ortloff Trade Secrets.

150.    In consideration of UOP Russell's expenses in the form of license fees, UOP Russell acquired the right to benefit from the competitive advantage conferred by the Ortloff Trade Secrets.

151.    Upon information and belief, Exterran unlawfully misappropriated Ortloff's RSV and SCORE technologies, including the Ortloff Trade Secrets, bearing little or none of the expense incurred by UOP Russell, thereby gaining a special advantage and free ride in competition with UOP Russell.  This allowed Exterran to unfairly avoid including Ortloff's licensing fees in its quoted prices, despite using the Ortloff Trade Secrets.

152.    As a direct, foreseeable, and proximate result of Exterran's unfair competition, UOP Russell has been and/or will be damaged in the form of direct and consequential damages, including but not limited to lost bids, and other lost revenue and/or Exterran's unjust enrichment at the expense of UOP Russell.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Exterran on all Counts of this Complaint as follows:

A.    A permanent injunction against Exterran enjoining it from using the Ortloff Trade Secrets, directing return of all of the same, and enjoining Exterran from selling products or services that incorporate or were otherwise derived, in whole or in part, from the Ortloff Trade Secrets;

B.    An order compelling Exterran to have an independent forensic expert review Exterran's computer systems, including any and all e-mail or cloud storage accounts, and identify and delete any of the Ortloff Trade Secrets;

C.    All compensatory damages (direct and consequential) pled and proved;

D.       Plaintiffs' lost profits from any lost sales or revenue resulting from Exterran's misuse of the Ortloff Trade Secrets;

E.       Disgorgement of any benefit, unjust enrichment, or monetary gains stemming from Exterran's misuse of the Ortloff Trade Secrets;

F.       Attorneys' fees and costs in the suit herein;

G.       Exemplary damages in favor of Plaintiffs and against Exterran;

H.       Pre-judgment and post-judgment interest; and

I.       Such other and further relief as to this Court may seem just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the issues so triable in this action.

-33-

Date: September 29, 2020              Respectfully submitted,

                                     */s/ Michael C. Smith*
                                     Michael C. Smith
                                     Texas State Bar No. 18650410
                                     SIEBMAN, FORREST, BURG & SMITH, LLP
                                     113 East Austin Street
                                     Marshall, TX 75671
                                     Tel: (903) 938-8900
                                     Fax: (972) 767-4620
                                     Email: michaelsmith@siebman.com

                                     Rudolph A. Telscher, Jr.
                                     Missouri Bar No. 41072*
                                     rudy.telscher@huschblackwell.com
                                     Kara R. Fussner
                                     Missouri Bar No.54656*
                                     kara.fussner@huschblackwell.com
                                     HUSCH BLACKWELL LLP
                                     190 Carondelet Plaza, Suite 600
                                     St. Louis, MO 63105
                                     314.480.1500 Telephone
                                     314.480.1505 Facsimile

                                     Ryan B. Hauer
                                     Illinois Bar No. 6320758*
                                     ryan.hauer@huschblackwell.com
                                     HUSCH BLACKWELL LLP
                                     120 South Riverside Plaza, Suite 2200
                                     Chicago, IL 60606
                                     312.655.1500 Telephone
                                     312.655.1501 Facsimile

                                     **Pro Hac Vice* Application Pending

                                     ***Attorneys for Plaintiffs UOP LLC and UOP Russell
                                     LLC***